ITHACA INDUSTRIES, INC., Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 92–1045.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 27, 1993.

Decided Feb. 23, 1994.

**ARGUED:** Charles T. Zink, LONG, AL-DRIDGE & NORMAN, Atlanta, Georgia, for Appellant. Jonathan Samuel Cohen, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Patrick G. Jones, David M. Ivey, Phillip A. Bradley, Kendall L.

Houghton, LONG, ALDRIDGE & NORMAN, Atlanta, Georgia, for Appellant. Michael L. Paup, Acting Assistant Attorney General, Gary R. Allen, Ernest J. Brown, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

Before PHILLIPS and WILKINSON, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

## OPINION

MICHAEL, District Judge:

Ithaca Industries, Inc. (Ithaca) appeals from the decision of the Tax Court denying depreciation deductions for Ithaca's assembled workforce and assessing Ithaca for tax deficiencies as a result. Because we believe that the useful life of an assembled workforce such as Ithaca's has no reasonably ascertainable limits, we affirm.

## I.

At all relevant times for the purposes of this case, Ithaca was a Delaware corporation with its headquarters in Wilkesboro, North Carolina. The company manufactures hosiery, undergarments, and polo shirts in plants located in North and South Carolina, Georgia, and Arizona. On September 22, 1983, some 35 years after Ithaca was first founded, a corporation was formed for the purpose of acquiring the assets and business of the company. That corporation, called "New Ithaca Corporation," subsequently offered "Old Ithaca" $110 million in notes and cash in exchange for all of Old Ithaca's common stock. The purpose of the merger was primarily to provide liquidity to George Abbot, the company's retiring founder and majority stockholder.

After the transaction was completed on October 28, 1983, New Ithaca changed its name to Ithaca Industries, Inc., the appellant in this case. There were no negotiations with Old Ithaca prior to this date regarding the allocation of portions of the purchase price to the assets New Ithaca was to acquire. Prior to the merger, however, New Ithaca obtained an appraisal of Old Ithaca's assets, to be used to determine an allocation of basis for tax purposes. One such asset was Old Ithaca's assembled workforce of 5,153 hourly production workers and 212 staff employees.[1] The appraiser assigned this "workforce in place" a value of $7.7 million, with a useful life of seven years for production employees, and eight years for staff employees.

Based on the appraisal, Ithaca took depreciation deductions in the fiscal years ending February, 1984 and February, 1985. When appellee, Commissioner of the Internal Revenue Service (Commissioner) disallowed the deductions, Ithaca petitioned the Tax Court in April, 1989. The Tax Court found for the Commissioner on the workforce issue, holding that a workforce is non-depreciable because it is not a "wasting asset." *Ithaca Industries, Inc. v. Comm'r,* 97 T.C. 253, 1991 WL 151392 (1991). This appeal followed.

The central issue on appeal is whether an assembled workforce is an intangible asset having an ascertainable, limited useful life over which the value of the asset may be amortized. The Commissioner raised a second potential issue for the first time on appeal.[2] The Commissioner suggests that the applicable provisions of the Internal Revenue Code as of Ithaca's merger required it to make a specific election in order to obtain a "stepped-up" basis in the assets it acquired. Absent such an election, appellee submits, the basis in the acquired assets—including the assembled workforce—is a "carryover" basis of zero.[3] Without a basis, there obvi-

1. Also at issue below were certain raw materials supply contracts upon which Ithaca took depreciation deductions. Respondent did not take exception to the Tax Court's holding regarding the contracts.

2. As the Commissioner points out in his brief, respondent is free to rely upon any matter appearing in the record in support of the decision below without filing a cross-appeal. *See Schweiker v. Hogan,* 457 U.S. 569, 585 n. 24, 102 S.Ct. 2597, 2607 n. 24, 73 L.Ed.2d 227 (1982).

3. The carryover basis would be zero because Old Ithaca's assets were fully depreciated in its hands.

ously can be no depreciation, and the Commissioner asks us to affirm on those grounds.[4] We decline to pass on the merits of this question, however, principally because its development before us, and before the Tax Court, was incomplete. We therefore will resolve the case by deciding the appropriate tax treatment of an assembled workforce with a stepped-up basis in the surviving corporation's hands.

## II.

■ We begin with the prosaic observation that every asset declines in some manner, and thus, in theory, every asset could be amortized. This observation is set forth more or less in Section 167(a) of the Internal Revenue Code. At the time of Ithaca's merger, that section stated: "There shall be as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear ... of property used in the trade or business, or ... of property held for the production of income."[5] I.R.C. § 167(a) (1983). Things become a good deal more complicated, however, when we seek in practical terms to quantify "exhaustion" and "wear and tear" for the purpose of assigning depreciation deductions to specific assets. To do so, Congress has often had to resort to conventions.[6]

■ Courts too have adopted conventions,[7] one of which has been the categorical exclusion of "goodwill" and "going-concern value" from the purview of section 167. See Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240 (5th Cir.1973), cert. denied, 414 U.S. 1129, 94 S.Ct. 867, 38

L.Ed.2d 754 (1974). "While goodwill and going-concern value are often referred to conjunctively, technically going-concern value is the ability of a business to generate income without interruption, even though there has been a change in ownership; and goodwill is a 'preexisting' business relationship, based on a continuous course of dealing, which may be expected to continue indefinitely." Ithaca Industries, 97 T.C. 253 (slip op. at 17–18), 1991 WL 151392. These are elements of value which have always been understood to be non-depreciable, primarily because they do not decline in any readily ascertainable fashion, but also because their initial value is difficult to appraise.

■ One of the reasons the Tax Court felt that Ithaca's workforce was non-depreciable was because the workforce closely resembled going-concern value. Indeed, "the existence of a trained and operational staff allowed Ithaca to step into the shoes of Old Ithaca." Id. This approach, measuring the asset against the definition of going concern value, was supported by then-existing law, see Houston Chronicle, 481 F.2d 1240, but has been modified by the Supreme Court's recent holding in Newark Morning Ledger Co. v. United States, —— U.S. ——, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993). That case addressed only goodwill specifically, but its teaching is equally applicable to going-concern value. The Court stated, "we now hold that a taxpayer able to prove that a particular asset can be valued and that it has a limited useful life may depreciate its value

---

**4.** The Commissioner recognizes that his failure to appeal that portion of the Tax Court's decision allowing deductions for the raw materials supply contracts precludes him from making this argument with regard to those particular assets.

**5.** The term "property" includes intangibles. Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 1988 WL 90987 (1988), aff'd, 900 F.2d 266 (11th Cir.1990).

**6.** Section 168 of the Internal Revenue Code sets forth a variety of amortization schedules which assign recovery periods for various categories of depreciable assets. A new section 197 was added to the I.R.C. on August 10, 1993, which assigns a 15–year recovery period for intangible assets enumerated in that section. Had this sec-

tion existed in 1983, this case would be less difficult in one respect, for section 197(d)(1)(C)(i) includes "workforce in place" as an intangible asset subject to depreciation over 15 years, a period roughly twice as long as the period Ithaca claimed. Of course, the difficulty of assigning an initial value to such a workforce still would remain.

**7.** In fact, the Treasury Regulations appear to envision an evolving case law on the question of depreciability. Section 1.167(a)–3 of those Regulations provides that a depreciation deduction may be taken only when an asset "is known from experience or other factors to be of use in the business or in the production of income for only a limited period...." 26 C.F.R. § 1.167(a)–3 (1993) (emphasis supplied).

over its useful life *regardless of how much the asset appears to reflect the expectancy of continued patronage....*" *Id.* —— U.S. at ——, 113 S.Ct. at 1681 (emphasis supplied). Thus, it is no longer appropriate to classify an intangible asset based on its resemblance to the classic conception of goodwill or going-concern value, and Ithaca's deduction cannot be denied on that basis.

▉ *Newark Morning Ledger* does not, however, wholly eliminate a categorical approach to the question whether an asset declines, or "wastes," within the meaning of section 167. The Court left intact the so-called "mass asset" rule, which

> provides that certain kinds of intangible assets are properly grouped and considered as a single entity; even though the individual components of the asset may expire or terminate over time, they are replaced by new components, thereby causing only minimal fluctuations and no measurable loss in the value of the whole.

*Id.* at 1676.[8] A mass asset is thought to be non-wasting, and therefore not depreciable, because it is continually regenerated, such that at any given time, the asset is the same in all material respects as it always has been. This is so even when the asset's constitutive elements change over time.

On its face, then, a workforce that remains constant in size and function over the years would appear to be a quintessential mass asset. As employees leave the workforce, new individuals are hired to assume the responsibilities of each vacant position. These new employees are indeed distinct from the individuals who made up the original workforce, but for all practical purposes the assembled workforce as a whole is preserved.

▉ As the Court suggested in *Newark Morning Ledger,* however, the distinguishing feature of a true mass asset is its ability to be regenerated without substantial effort on the part of its owner, that is, its ability to "self-regenerate." [9] When an asset is maintained only by significant affirmative efforts to add new elements, these additions are most naturally understood as comprising something new and distinct from the original asset. Conceptually, the "old" asset continues to decline, even as the owner acquires new elements to offset declining productivity in the combination of elements that is the old asset. Though the line of demarcation is subtle, this situation is analytically distinct from one in which the asset is replenished without significant effort; such a "self-regenerating" asset requires little or no active addition of new elements to preserve it against decline. Thus, when an intangible asset such as a workforce is maintained only by obtaining costly replacements, those replacements do not prevent decline in the existing asset so much as they contribute to what might be considered a new one. In

---

8. We emphasize, however, that the potential application of the mass asset rule in this case has nothing to do with whether the workforce appears to contribute to going concern value. The Supreme Court has indicated that after *Houston Chronicle,* the rule could no longer serve as authority for classing all assets "related to the expectancy of continued patronage" as inseparable components of the single non-depreciable asset of goodwill. *Newark Morning Ledger,* —— U.S. at ——, 113 S.Ct. at 1677. The reasoning of *Houston Chronicle* would also prohibit application of the mass asset rule to defeat amortization of all assets contributing to the expectancy of uninterrupted business, that is, to going concern value. Thus, along with the classic conception of goodwill and going concern value, *Newark Morning Ledger* subsumes the mass asset rule under a broader inquiry aimed at determining whether the asset can be valued and whether its useful life is limited. *See infra,* note 11 and accompanying text.

9. The Court's discussion of the District Court's opinion in *Newark Morning Ledger* illustrates the importance of the concept of self-regeneration to the mass asset rule:

> Petitioner also proved to the satisfaction of the District Court that its "paid subscriber" asset [a list of subscribers obtained by one newspaper in its takeover of another] was not self-regenerating, *thereby distinguishing it for purposes of applying the mass-asset rule:*
> "[T]here is no automatic replacement for a subscriber who terminates his or her subscription. Although the total number of subscribers may have or has remained relatively constant, ... those that may or have discontinued their subscriptions can be or have been replaced only through the substantial efforts of [the newspaper]."

*Newark Morning Ledger,* —— U.S. at ——, 113 S.Ct. at 1681 (emphasis supplied) (citation omitted).

such a case, the "mass asset rule" would not defeat amortization of the asset.

The distinction is crucial in this case, for Ithaca's workforce as a whole was indeed regenerated each time a new worker was brought in to fill a vacancy, such that the size and function of the workforce remained essentially the same. This regeneration, however, was accomplished only through Ithaca's substantial efforts. Absent those efforts, the workforce as it was constituted on the date of the merger would have declined until there were no employees left in it. Ithaca did not have replacement workers standing ready to be hired and put to work without significant preparation. On the contrary, the record indicates that Ithaca had to train its workers extensively, and in some cases even had to recruit them.[10] In fact, it is these expenses which form the basis of the value Ithaca has assigned to the workforce. Under these circumstances, the mass-asset rule does not deny Ithaca a depreciation deduction for its workforce.

The inquiry must therefore turn to whether Ithaca's workforce has an ascertainable value and a limited useful life.[11] Because the Tax Court did not feel that a regenerating asset such as a workforce could waste, it did not undertake to assess Ithaca's statistical evidence on these questions in any detail. We need not pay detailed attention to Ithaca's statistical methodology, either, but we look beyond this evidence for a different reason. We do not doubt that Ithaca's workforce, as constituted on the day of the merger, began to decline in size and value with the first resignation, termination, or death in that workforce, and that it continued to decline due to these and other factors. Nor do we take issue at this time with the value Ithaca placed on that workforce.[12] The difficulty in our view is that under these circumstances there can be no defensible estimation of the duration of any one person's employment, nor of the useful life of the workforce of which he or she is a part.

In *Newark Morning Ledger*, the taxpayer was a newspaper which sought to amortize the body of subscriptions it obtained from another newspaper in a merger. Despite the fact that new subscriptions were coming in daily to replace lapsed ones, the Court allowed Newark Morning Ledger to depreciate the old subscription list. It did so, however, only because the body of subscriptions as it was constituted on the merger date "was not composed of constantly fluctuating components; rather, it consisted of identifiable subscriptions each of which had a limited useful life that could be estimated with reasonable accuracy according to generally accepted statistical principles." *Newark Morning Ledger*, —— U.S. at ——, 113 S.Ct. at 1681. Though each subscription was terminable at will by the subscriber, there were some 460,-000 paid subscribers on the list Newark

---

10. Ithaca's recruiting and training expenses may well have been deductible, but the tax treatment of these expenses is irrelevant to the issue of self-regeneration and the application of the mass asset rule. Cf. *Computing & Software, Inc. v. Comm'r*, 64 T.C. 223, 236–37, 1975 WL 3186 (1975) (original body of credit information amortizable despite continual replacement with new information by clerks whose pay was currently deductible). After all, even if a traditionally depreciable, tangible business asset like a truck could be preserved indefinitely with new parts and the labor required to install them, we would not think that the truck was self-regenerating and non-wasting simply because the expenses of this maintenance were deductible. The important question is whether the asset's maintenance is accomplished by significant efforts not already expended in the initial formation or purchase of the asset.

11. Of course, this broader inquiry addresses many of the same issues with which the mass

asset rule is concerned. As the Fifth Circuit noted in *Houston Chronicle*, "[m]ost of the cases purporting to apply the 'mass asset' rule involve evidentiary failures on the part of the taxpayer[,]" namely, a failure to show that the asset has an ascertainable value and a limited useful life. 481 F.2d at 1249–50. Stated another way, if the taxpayer is unable to counter the inference that his asset self-regenerates, and is therefore a mass asset, he has also failed to prove that the useful life of his asset is limited.

12. We must note, however, our concern with Ithaca's use of the cost of recruiting and training replacement workers as a proxy for the value of the workforce obtained from Old Ithaca. The two groups of workers may not be sufficiently comparable to allow this approach. Cf. *Newark Morning Ledger*, —— U.S. at ——, 113 S.Ct. at 1682 (citing district court's finding that new newspaper subscribers were not comparable in value to customers on existing subscriber list).

Morning Ledger obtained. The large sample size enabled the newspaper's experts to employ historical and demographic data on mortality and relocation rates, as well as changing tastes and media competition, to arrive at an estimate of useful life.[13]

Without intimating a view whether Newark Morning News' method would produce an *adequate* estimate, we can say that this case presents a rather different set of circumstances. An employee is not a subscription; indeed, a workforce consisting of human beings perhaps could be no better described than as "composed of constantly fluctuating components." We note in this regard that the record discloses no predetermined limits of any sort, contractual or otherwise, upon the relationship between Ithaca and its employees. This means that in contrast to a subscription, which is susceptible mainly to the influences affecting one actor, the subscriber, a single employment relationship is susceptible to changing influences affecting two actors, the employer and the employee.

We are not persuaded that Ithaca can control for these influences. With a large enough sample size and a test period of sufficient length, it is conceivable that pertinent variables and reliable patterns of attrition could be identified. This, after all, is the purported accomplishment of actuarial compilations used in the insurance industry. And theoretically, similar data might be derived from very small, exceptionally stable

environments. But we are far from being able to perform such feats reliably with a sample size of roughly 5,000 different people, over only a four-year period, and with only four classifications by job type.[14]

Ithaca's representation that its estimate of attrition rate was borne out following the merger does not convince us otherwise. An unforeseen change in any pertinent variable might have radically undermined Ithaca's estimate at any time, and the fact that it did not is in this court's judgment little more than happenstance. The revenue consequences are simply too serious to tolerate this level of imprecision, and we cannot now envision an approach to a workforce such as Ithaca's that would not suffer from the same shortcomings as Ithaca's statistical method.[15]

In sum, we hold that Ithaca's workforce was not an amortizable asset because its characteristics suggest no sufficiently accurate means of estimating its useful life. In the absence of a firmer foundation, we must also decline to choose an appropriate useful life convention. If any conventions are to be adopted to end the intractable struggles over the depreciability of intangible assets such as this, it is the province of Congress to do so.[16] The opinion of the Tax Court is therefore

*AFFIRMED.*

PHILLIPS, Circuit Judge, concurring in part and dissenting in part:

---

13. The Government contested none of this evidence, but chose instead to stand on the assertion that "paid subscribers" are indistinguishable from the concept of goodwill. The adequacy of Newark Morning Ledger's evidence thus was not directly before the Court.

14. Ithaca's statistical expert, Dr. Doerfler, analyzed Old Ithaca's employment experience from 1979 until the merger date, assessing the average useful lives for workers in four categories: hourly and production workers, executives, salaried employees, and clerical employees.

15. We are mindful, of course, that in *Citizens & Southern Corp. v. Comm'r*, 91 T.C. 463, 1988 WL 90987 (1988), *aff'd*, 919 F.2d 1492 (11th Cir. 1990) (per curiam), the Tax Court approved Dr. Doerfler's useful life analysis, a methodology similar to the one employed here. *Citizens & Southern*, however, dealt with the depreciability of a bank's deposit base. We believe, as we have indicated, that a workforce such as Ithaca's po-

ses a far greater challenge. A workforce is an unusual asset because it is not only affected by human decisionmaking, but is actually *composed* of multiple human actors. As such, it is directly affected by the complex interactions of its employees, and by any number of other influences operating upon these actors both in and out of the workplace. This substantial human element injects vagaries into the useful life analysis that make inapt, on the facts of this case, the analysis used in *Citizens & Southern.*

16. In this vein, Congress adopted section 197 of the Internal Revenue Code in August, 1993. *See supra*, note 6. The avowed purpose of section 197 was to eliminate "the considerable controversy" that has existed between taxpayers and the Internal Revenue Service over whether and how to amortize intangible assets, a controversy which Congress predicted would continue even after *Newark Morning Ledger. See* H.R.Rep. No. 103–11, 103rd Cong., 1st Sess. 760 (1993). As

I agree completely with Judge Michael's excellent legal analysis leading to the conclusions that (1) Ithaca Industries' claimed deduction is not defeated by the mass asset rule, and (2) could only be defeated by a determination that its workforce either had no ascertainable value upon acquisition or no ascertainable limited life thereafter. I disagree however, with the further conclusion that we should decide as a matter of law on this appeal that it had neither.

Those issues should, I believe, be remanded for first instance determination by the Tax Court where they were raised but not decided. I think we jump the gun in deciding (as I read the majority opinion) that as a matter of law *no* statistical methodology (not just that of Ithaca Industries' original proffer) could provide a sufficiently trustworthy evidentiary basis for finding both ascertainable value and limited useful life for this work force. *See* pp. 689–91. I believe instead that the Tax Court as trier-of-fact should originally make that assessment. It might well decide, after carefully considering the proffered evidence, that it had just the inherent incapacity the majority assigns it. But it might in the context of an appropriate evidentiary hearing find a sufficiency of strength that we are not in too good a position to assess without benefit of any first-instance effort by the base-line trier-of-fact.

For that reason, I would remand those issues for determination by the Tax Court.

counsel for the Commissioner stated at oral argument, however, the new section is merely a con-

vention, meant only to bring "peace."