121 T.C. No. 13


UNITED STATES TAX COURT


FEDERAL HOME LOAN MORTGAGE CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 3941-99, 15626-99.     Filed September 29, 2003.


        P was originally exempt from Federal income
taxation.  However, on Jan. 1, 1985, P became subject
to taxation under the Deficit Reduction Act of 1984
(DEFRA), Pub. L. 98-369, sec. 177, 98 Stat. 709.  P had
entered into certain financing arrangements before Jan.
1, 1985, the proceeds of which were used in P's
mortgage business.  As of Jan. 1, 1985, the contract
rates of interest on these financing arrangements were
less than the market rates of interest as of that date,
because of an increase in interest rates since the date
on which P entered into the respective arrangements.  P
claims that the economic benefit of the below-market
financing as of Jan. 1, 1985, is an intangible asset
subject to amortization.  P claimed amortization
deductions on the basis of the fair market value of
that alleged intangible asset as of Jan. 1, 1985,
pursuant to the special basis provisions that are
applicable to P under DEFRA sec. 177(d)(2)(A)(ii).  The
issue presented by the parties' cross-motions for
partial summary judgment is whether, as a matter of
law, the benefit of below-market borrowing costs from

P's financing arrangements on Jan. 1, 1985, can be an intangible asset that could be amortized for tax purposes.

Held:  The benefit attributable to P's below-market financing as of Jan. 1, 1985, can, as a matter of law, constitute an intangible asset which could be amortized if P establishes a fair market value and a limited useful life.

Robert A. Rudnick, Stephen J. Marzen, James F. Warren, and Neil H. Koslowe, for petitioner.

Gary D. Kallevang, for respondent.

OPINION

RUWE, Judge:  Respondent determined deficiencies in petitioner's Federal income taxes in docket No. 3941-99 for 1985 and 1986, as follows:

| Year | Deficiency |
|------|------------|
| 1985 | $36,623,695 |
| 1986 | 40,111,127 |

Petitioner claims overpayments of $9,604,085 for 1985 and $12,418,469 for 1986.

Respondent determined deficiencies in petitioner's Federal income taxes in docket No. 15626-99 for 1987, 1988, 1989, and 1990, as follows:

| Year | Deficiency |
|------|-----------|
| 1987 | $26,200,358 |
| 1988 | 13,827,654 |
| 1989 | 6,225,404 |
| 1990 | 23,466,338 |

Petitioner claims overpayments of $57,775,538 for 1987, $28,434,990 for 1988, $32,577,346 for 1989, and $19,504,333 for 1990.

Petitioner and respondent filed cross-motions for partial summary judgment under Rule 121[1] on the question of whether petitioner is entitled to amortize the economic benefit of certain debt obligations which had below-market interest rates on January 1, 1985, the date petitioner became subject to Federal income taxation. Petitioner claims entitlement to amortize its favorable financing using a fair market value basis as of that date. Petitioner determined the fair market value of the claimed favorable financing to total $456,021,853 on January 1, 1985, and claims the following amortization deductions for taxable years 1985 through 1990:

---

[1]All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the taxable years in issue, unless otherwise indicated.

| Taxable Year | Amortization Deduction |
|---|---|
| 1985 | $50,219,116 |
| 1986 | 48,702,457 |
| 1987 | 47,017,000 |
| 1988 | 45,835,556 |
| 1989 | 40,680,420 |
| 1990 | 38,028,084 |

In this Opinion, we decide whether the benefit of petitioner's favorable financing can, as a matter of law, constitute an intangible asset for tax purposes.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time of filing the petition, petitioner's principal office was located in McLean, Virginia. At all relevant times, petitioner was a corporation managed by a board of directors.

Petitioner was chartered by Congress on July 24, 1970, by the Emergency Home Financing Act of 1970, Pub. L. 91-351, title III (Federal Home Loan Mortgage Corporation Act), 84 Stat. 451. Petitioner was originally exempt from Federal income taxation. However, Congress repealed petitioner's Federal income tax exemption status in the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, sec. 177, 98 Stat. 709. Pursuant to this Act, petitioner became subject to Federal income taxation, effective January 1, 1985.

Petitioner was established to purchase residential mortgages and to develop and maintain a secondary market in conventional mortgages.[2] Since the time of its incorporation, petitioner has facilitated investment by the capital markets in single-family and multi-family residential mortgages. In the course of its business, petitioner acquires mortgages from originators. Petitioner either resells the acquired mortgages in securitization transactions, principally by pooling the mortgages and issuing participation certificates (PCs),[3] or it holds them to maturity in its retained mortgage portfolio, generally financing this activity by the issuance of various debt instruments. Petitioner is a profit-making business whose net income (for book purposes) was approximately $208 million in 1985. In 1984, petitioner acquired 550,000 mortgage loans, sold $20.5 billion in mortgage-related securities, and posted corporate earnings of $267.4 million.

Petitioner claims that it held a certain intangible asset, which it identifies as "favorable financing", on January 1, 1985.

---

[2]A "conventional mortgage" is a mortgage that is not guaranteed or insured by a Federal agency. The "primary mortgage market" is composed of transactions between mortgage originators (lenders) and homeowners or builders (borrowers). The "secondary market" generally consists of sales of mortgages by originators and purchases and sales of mortgages and mortgage-related securities by institutional dealers and investors.

[3]PCs are securities representing beneficial ownership of the principal and interest payments on a pool of mortgages.

The "favorable financing" consisted of a number of financing arrangements, the interest rates payable on which were below those currently prevailing in the financial markets on January 1, 1985, because of an increase in interest rates since the date on which petitioner entered into the respective arrangements. Those financing arrangements consisted essentially of issuances of: (1) Notes and bonds payable; (2) subordinated debt (capital debentures and zero coupon bonds); (3) collateralized mortgage obligations (CMOs); and (4) guaranteed mortgage certificates (GMCs). Petitioner claims that the net present value of future cashflows computed at market rates as of January 1, 1985, exceeded the net present value of future cashflows for each respective instrument at its contract rate. It is this difference that petitioner claims as its favorable financing asset as of January 1, 1985. Petitioner has not reported its favorable financing as an asset on its books or on any financial statement. Petitioner did not acquire its favorable financing in any purchase transaction.

Under DEFRA section 177(d)(2)(A)(ii), 98 Stat. 711, Congress provided a specific adjusted basis for determining gain on the sale or other disposition of property held by petitioner on January 1, 1985. DEFRA section 177(d)(2)(A)(ii) provides that the adjusted basis of any asset of petitioner shall "for purposes of determining any gain, be equal to the higher of the adjusted

basis of such asset or the fair market value of such asset as of such date." Section 167(g), which forms the basis for amortization deductions, provides that "The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011, for the purpose of determining the gain on the sale or other disposition of such property". In a prior Opinion, <u>Fed. Home Loan Mortgage Corp. v. Commissioner</u>, 121 T.C. ___ (2003), we held that, under section 167(g), petitioner's adjusted basis for purposes of amortizing intangible assets held on January 1, 1985, is determined under the specific adjusted basis rule in DEFRA section 177(d)(2)(A)(ii). Pursuant to DEFRA section 177(d)(2)(A)(ii), petitioner claims entitlement to amortize its favorable financing using a fair market value basis as of January 1, 1985.

Discussion

I. <u>Standards for Partial Summary Judgment</u>

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. <u>FPL Group, Inc. v. Commissioner</u>, 116 T.C. 73, 74 (2001). Either party may move for summary judgment upon all or any part of the legal issues in controversy. Rule 121(a); <u>FPL Group, Inc. v. Commissioner</u>, <u>supra</u> at 74. A decision will be rendered on a motion for partial summary judgment if the pleadings, answers to interrogatories,

depositions, admissions, and other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law.  Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002).  The moving party has the burden of proving that no genuine issue of material fact exists and that moving party is entitled to judgment as a matter of law. Rauenhorst v. Commissioner, 119 T.C. 157, 162 (2002).

II.  Amortization of Intangible Assets

Section 167(a) provides:

> SEC. 167(a).  General Rule.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)--
>
>> (1) of property used in the trade or business, or
>
>> (2) of property held for the production of income.

Section 1.167(a)-3, Income Tax Regs., which interprets section 167(a), provides:

> If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance.  Examples are patents and copyrights.  An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation.  No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful

> life.  No deduction for depreciation is allowable with respect to goodwill.  * * *

For an intangible asset to be amortizable under section 167(a), the taxpayer must prove with reasonable accuracy that the asset is used in the trade or business or held for the production of income and has a value that wastes over an ascertainable period of time.  Newark Morning Ledger Co. v. United States, 507 U.S. 546, 566 (1993); FMR Corp. v. Commissioner, 110 T.C. 402, 430 (1998).  The taxpayer must prove that the intangible asset has a limited useful life, the duration of which can be ascertained with reasonable accuracy, and the asset has an ascertainable value separate and distinct from goodwill and going-concern value.  S. Bancorporation, Inc. v. Commissioner, 847 F.2d 131, 136-137 (4th Cir. 1988), affg. T.C. Memo. 1986-601.  In this Opinion, our primary concern is whether, as a matter of law, petitioner's asserted favorable financing can constitute an "asset" for purposes of section 167(a).

III.  Analysis

Petitioner argues that its favorable financing represented a valuable economic benefit on January 1, 1985, and is an intangible asset subject to amortization.  Petitioner claims that the fair market value of this "asset" is measured by the difference between the market cost of using the borrowed money and its below-market cost.  Respondent argues that petitioner's

favorable financing arose from fortuitous interest rate fluctuations, is not an asset, and is not amortizable as a matter of law.

The parties in these cases stipulated that petitioner's favorable financing "consisted of a number of financing arrangements, the interest rates payable on which were below those currently prevailing in the financial markets on January 1, 1985, owing to an increase in interest rates since the date on which Petitioner entered into the respective arrangements."[4] Simply put, favorable financing represents a right to use borrowed money at below-market interest rates.[5]

It is beyond doubt that the right to use money represents a valuable property interest. Indeed, in Dickman v. Commissioner, 465 U.S. 330, 337 (1984), the U.S. Supreme Court stated that "The

---

[4]Respondent disputes that petitioner's favorable financing has been substantiated as to original cost, or as to value (whether fair market value, book value, or salvage value) as of any date, including Jan. 1, 1985, or as to useful life. Respondent does not dispute that the CMOs and the GMCs are debt for Federal income tax purposes but disputes that the CMOs and the GMCs are debt of petitioner for purposes of the favorable financing, and he contends that any claimed favorableness resulting from higher comparable market rates on the CMOs and the GMCs would not accrue to, nor be to the benefit of, petitioner. We express no view as to these matters in this Opinion.

[5]In computing the fair market value of its favorable financing, petitioner does not include any offset for unfavorable debt; i.e., those debt obligations of petitioner that carried above-market interest rates as of Jan. 1, 1985. Respondent alludes to this fact in his memoranda but provides no argument as to its bearing on the legal issue before us.

right to use money is plainly a valuable right, readily measurable by reference to current interest rates".[6]  See also Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 648 (1980); Rev. Rul. 81-160, 1981-1 C.B. 312; cf. sec. 7872.  It is also clear that the right to use borrowed money is interrelated with its corresponding interest cost.

Interest represents the cost of using borrowed money.  See, e.g., Snyder v. Commissioner, 93 T.C. 529, 546 (1989).  For example, in Albertson's, Inc. v. Commissioner, 95 T.C. 415, 421 (1990), affd. 42 F.3d 537 (9th Cir. 1994), we stated:

> Interest is "the amount which one has contracted to pay for the use of borrowed money."  (Emphasis added.)  Old Colony Railroad Co. v. Commissioner, 284 U.S. 552, 560 (1932).  Interest is also commonly defined as "compensation for the use or forbearance of money."  (Emphasis added.)  Deputy v. du Pont, 308 U.S. 488, 498 (1940).  Interest is the equivalent of "rent" for the use of funds.  Dickman v. Commissioner, 465 U.S. 330, 339 (1984).  Implicit in these three definitions of interest is the concept that interest is a payment for the use of money that the lender had the legal right to possess, prior to relinquishing possession rights to the debtor.  [Fn. ref. omitted.]

Thus, there is a correlative relationship among the right to use borrowed money, interest paid for the use of borrowed money, and the intangible value of this right to use borrowed money.  For example, if current market rates of interest fluctuate to a rate

---

[6]In Dickman v. Commissioner, 465 U.S. 330, 338 (1984), the U.S. Supreme Court held that the interest-free loan of funds was a transfer of property; i.e., a gift of the reasonable value of the use of the money lent, for purposes of the gift tax.

which is lower than the contract rate of interest, the obligor is paying essentially a higher cost for the use of the borrowed money. Alternatively, if current market rates of interest fluctuate to a rate which is higher than the contract rate of interest, the obligor is paying essentially a lower cost for the use of the borrowed money. In this circumstance, the obligor stands in a better position than other borrowers that finance at the current market rates of interest. The important point to be made is that an obligor's right to use borrowed money under an existing debt obligation may be more or less valuable depending on the current market rates of interest. See, e.g., <u>Dickman v. Commissioner</u>, <u>supra</u> at 337. Thus, we agree with petitioner that the right to use borrowed money at below-market interest rates represents a valuable economic benefit in terms of the cost savings that can be achieved in financing income-producing activities. It is a benefit for which a third party would pay a premium if the favorable financing were included as a part of a purchase transaction. Following this analysis, since petitioner's favorable financing involves a right to use borrowed money at below-market rates as of January 1, 1985, we have no trouble concluding that petitioner's favorable financing arrangements represented something of value as of that date.

Respondent agrees that "there is a measurable economic value associated with the right to use money." However, respondent

claims that "Once the debtor enters into a debt obligation for a fixed rate, a subsequent increase in market rates of interest over the obligation's fixed contract rate does not create an asset, amortizable or otherwise." Respondent claims that petitioner's favorable financing involves only the differential between market rates of interest and the contract rates of interest stated in petitioner's debt obligations. Respondent argues that this differential is not an asset, it is "fortuitous", and it is "not a function of an expenditure".

Respondent's contentions are similar to the arguments the Commissioner made in Ithaca Indus., Inc. v. Commissioner, 97 T.C. 253 (1991), affd. 17 F.3d 684 (4th Cir. 1994). In that case, the taxpayer sought to amortize the value of certain favorable raw material contracts that it had purchased as part of a stock acquisition. We held that the favorable raw material contracts constituted an intangible asset subject to amortization. Id. at 275. We stated in that case:

> Respondent argues that the life of the contracts is indefinite because any value inhering in the contracts exists only so long as the favorable price spread is predicted to exist. Respondent argues that because yarn prices fluctuate, it is impossible to predict with any accuracy the length of time the spread would exist. We find this argument unpersuasive. The favorable spread of the contracts is not the asset being amortized. The asset is the contracts themselves. The favorable spread is used only to determine the value of the contracts. [Id. at 274.]

Similarly, in these cases, petitioner seeks to amortize the right to use borrowed money provided for in its various debt obligations. The differential between the market rate of interest and the contract rate of interest serves as a measure of the economic value of that right as of January 1, 1985. Thus, we cannot agree with respondent's attempt to analyze petitioner's right to use borrowed money separately from the comparable cost of that use. For the reasons discussed above and in Dickman v. Commissioner, 465 U.S. 330 (1984), the right to use borrowed money is interrelated with the corresponding interest cost of that right, in much the same way that the right to use property is interrelated with its corresponding rental cost.

Petitioner's interest in its favorable financing is in many respects analogous to a bank's interest in its "deposit base" or "core deposits", which we have held to be an intangible asset amortizable for tax purposes. "The term 'deposit base' describes 'the intangible asset that arises in a purchase transaction representing the present value of the future stream of income to be derived from employing the purchased core deposits of a bank.'" Newark Morning Ledger Co. v. United States, 507 U.S. at 561 n.11 (quoting Citizens & S. Corp. v. Commissioner, 91 T.C. 463, 465 (1988), affd. 919 F.2d 1492 (11th Cir. 1990)). "The value of the deposit base rests upon the 'ascertainable probability that inertia will cause depositors to leave their

funds on deposit for predictable periods of time.'"  Id. at 562

(quoting Citizens & S. Corp. v. Commissioner, supra at 500); see

also Colo. Natl. Bankshares, Inc. v. Commissioner, T.C. Memo.

1990-495, affd. 984 F.2d 383 (10th Cir. 1993).

Core deposits typically consist of low-cost accounts such as

regular savings accounts, deposit transaction accounts (e.g.,

regular checking accounts), time deposit open accounts, etc., see

Citizens & S. Corp. v. Commissioner, supra at 465, but do not

typically include "Adjustable rate deposit accounts", such as

certificates of deposit, money market deposit accounts, and super

NOW (negotiable order of withdrawal) accounts, which are designed

to be sensitive to market interest rates, see IT&S of Iowa, Inc.

v. Commissioner, 97 T.C. 496, 517 (1991); Peoples Bancorporation

& Subs. v. Commissioner, T.C. Memo. 1992-285.  In Citizens & S.

Corp. v. Commissioner, supra at 465-466, we described core

deposits as:

> a relatively low-cost source of funds, reasonably
> stable over time, and relatively insensitive to
> interest rate charges.  A bank typically invests the
> funds from deposits in loans and other income-producing
> assets, and receives fees for services rendered to its
> depositors.  A bank also incurs expenses in
> establishing, processing, and maintaining deposit
> accounts.  The excess of the income generated over the
> associated costs represents the profit attributable to
> core deposits. * * *

In Citizens & S. Corp., the seminal case involving deposit

base, the taxpayer sought to amortize the deposit base that it

acquired in a purchase of a number of banks.  The taxpayer sought
to amortize the present value of the income that it expected to
derive from the use of the core deposits which it had acquired in
those transactions.  The Commissioner argued that deposit base
was not a separate and distinct asset from the goodwill of the
acquired banks since deposit base involved terminable-at-will
customer relationships.  We held that deposit base represents an
intangible asset subject to amortization under section 1.167(a)-
3, Income Tax Regs., where a taxpayer can prove that core
deposits have an ascertainable value separate and distinct from
the goodwill and going-concern value of the bank acquired:

> The evidence in the instant case establishes that
> the acquisition of core deposits was the primary reason
> petitioner purchased the Acquired Banks and that
> petitioner paid a premium in order to obtain the core
> deposits.  In Banc One Corp. v. Commissioner, * * * [84
> T.C. 476, 490 (1985)], we stated that "Often the
> assumption of the deposit liabilities, rather than the
> purchase of the assets, represents the economic purpose
> behind the acquisition of a bank."  These core deposits
> are a low-cost source of funds and are an important
> factor contributing to the profitability of a
> commercial bank.  Moreover, the economic value
> attributable to the opportunity to invest the core
> deposits can be valued.  The value is based solely upon
> the core deposits acquired in the purchase. * * *   The
> value of deposit base rests upon the ascertainable
> probability that inertia will cause depositors to leave
> their funds on deposit for predictable periods of time.
> * * *   [Id. at 498-500; fn. ref. omitted.]

We have reiterated that holding in a number of cases following
our holding in Citizens & S. Corp.  See, e.g., IT&S of Iowa, Inc.
v. Commissioner, supra; First Chicago Corp. v. Commissioner, T.C.

Memo. 1994-300; <u>Trustmark Corp. v. Commissioner</u>, T.C. Memo. 1994-184; <u>Peoples Bancorporation v. Commissioner</u>, <u>supra</u>; <u>Colo. Natl. Bankshares, Inc. v. Commissioner</u>, <u>supra</u>.  In doing so, this Court and the Courts of Appeals have rejected the Commissioner's argument that deposit base is not amortizable as a matter of law.[7]

We believe the cases involving core deposits support petitioner's position that favorable financing is an intangible asset subject to amortization.  Petitioner's favorable financing is in many respects similar to the core deposits considered in the above cases.  Like the core deposits in those cases, favorable financing involves the use of borrowed money at below-market rates.  Like core deposits, below-market financing arrangements provide a less expensive means of generating income and contribute to the profitability of a business.

Respondent claims that the cases involving core deposits are distinguishable because "The core deposits at issue were customer-based intangibles representing stable deposits that

---

[7]We also point out that the U.S. Supreme Court discussed our holding in <u>Citizens & S. Corp. v. Commissioner</u>, 91 T.C. 463 (1988), affd. 919 F.2d 1492 (11th Cir. 1990), favorably in its opinion in <u>Newark Morning Ledger Co. v. United States</u>, 507 U.S. 546, 561-562 (1993).  See <u>Trustmark Corp. v. Commissioner</u>, T.C. Memo. 1994-184 ("the Supreme Court has cited <u>Citizens & Southern Corp.</u> with approval and has rejected respondent's underlying legal argument that as a matter of law core deposits * * * are inseparable from goodwill/going concern value and thus nondepreciable").

banks expect to retain for extensive lengths of time." Respondent contends that "Petitioner has nothing comparable to a core group of depositors who, through their inertia and their focus on savings accumulation instead of market-based returns, are willing to leave funds on deposit at below-market rates for extended periods of time."

We agree with respondent that deposit base involves what we might term a "customer-based intangible". See, e.g., sec. 197(d)(2)(B). However, we cannot agree that this effectively distinguishes the above cases. Indeed, the customer relationships in the cases involving core deposits formed the basis for the Commissioner's objections to the taxpayer's amortization deductions for deposit base. However, apart from a customer-based relationship, deposit base, like the favorable financing in the instant cases, involves a debtor-creditor relationship. Also, like petitioner's favorable financing, core deposits represent a relatively low-cost source of funds, see Citizens & S. Corp. v. Commissioner, 91 T.C. at 465, which carry below-market interest rates, and which support the obligor's financing of its profit-making activities. Also, in the same manner that an acquirer of a bank with an established deposit base would pay a premium for deposit base of the target bank, we believe that the hypothetical buyer would pay a premium for the acquisition of a company with below-market indebtedness.

Respondent also argues that the cases involving core deposits are distinguishable because "The core deposits in those cases were acquired as part of a larger acquisition, unlike petitioner's self-created 'asset.'" Respondent's argument perhaps represents a broader criticism of petitioner's position with respect to its favorable financing because, admittedly, petitioner's favorable financing was not acquired in any purchase transaction, and both parties seem to agree that petitioner has not incurred any costs with respect to its favorable financing such that it would have an adjusted cost basis in that alleged intangible asset.

In IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 507-508 (1991), we stated:

> To qualify for a depreciation deduction, petitioners must show that the deposit core acquired from the * * * bank (1) had an ascertainable cost basis separate and distinct from the goodwill and going-concern value of such bank, and (2) had a limited useful life, the duration of which could be ascertained with reasonable accuracy. Donrey, Inc. v. United States, 809 F.2d 534, 537 (8th Cir. 1987); Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240, 1250 (5th Cir. 1973); Citizens & Southern Corp. v. Commissioner, 91 T.C. at 479. * * * [Fn. refs. omitted; emphasis added.]

See also Trustmark Corp. v. Commissioner, T.C. Memo. 1994-184 ("The core deposit intangible asset may be amortized upon a proper showing by petitioner of its cost basis and a reasonably accurate estimate of its useful life."). However, the primary

import of this statement is that an intangible asset must have an identifiable, separate, and distinct value apart from nonamortizable goodwill or going-concern value to be amortizable under section 1.167(a)-3, Income Tax Regs. Since the deposit base cases involved asset acquisitions, mergers, or stock acquisitions with a section 338 election,[8] and the taxpayers' positions in those cases were that they paid an allocable portion of the overall purchase price for the value of the deposit base of the target bank, this allocable portion represented their "ascertainable cost basis" for amortization under section 167(g).[9]

In the instant cases, we are dealing with a unique situation. Congress provided a specific adjusted basis for

---

[8]Sec. 338 allows an election in certain stock purchases by a corporation. Under this election, the corporation whose stock was acquired is treated: (1) As having sold all its assets at the close of the acquisition date at fair market value in a single transaction, and (2) as a new corporation which purchased all those assets as of the beginning of the day after the acquisition date. Sec. 338(a). Under sec. 338(b), the basis allocated to the "acquired" assets is determined by reference to the purchase price of the stock. First Chicago Corp. v. Commissioner, T.C. Memo. 1994-300.

[9]Sec. 167(g) provides that "The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property." Sec. 1011 generally provides an adjusted cost basis for purposes of determining gain or loss. See also secs. 1012 (cost basis), 1016 (adjustments); Fed. Home Loan Mortgage Corp. v. Commissioner, 121 T.C. ___ (2003).

petitioner for purposes of determining its gain on the sale or other disposition of property held on January 1, 1985. See DEFRA sec. 177(d)(2)(A)(ii). In Fed. Home Loan Mortgage Corp. v. Commissioner, 121 T.C. ___ (2003), we held that since section 167(g) requires the use of the basis for determining gain as the basis for amortization of intangible assets and since DEFRA section 177(d)(2)(A)(ii), 98 Stat. 711, replaced the regular adjusted cost basis rule of section 1011 for purposes of determining gain, petitioner's basis for amortizing any intangibles it held on January 1, 1985, is the higher of the regular adjusted cost basis or fair market value of petitioner's intangible assets as of that date. Given this special circumstance, we do not find the cases involving core deposits distinguishable for the reason that respondent claims. It follows from our previous Opinion regarding the application of DEFRA section 177(d)(2)(A)(ii) that petitioner's failure to establish a "cost basis" does not prevent it from claiming a higher fair market value basis in its favorable financing. Thus, we do not believe an acquisition or an allocable cost is essential to petitioner's claim that it held an asset of value in the form of its favorable financing as of January 1, 1985.[10]

---

[10]Further, although relevant to the general question whether a taxpayer has an adjusted cost basis in an asset upon which amortization deductions can be based, adjusted cost basis is not determinative of whether there is in fact an intangible asset. See, e.g., Bartolme v. Commissioner, 62 T.C. 821, 830 (1974).

We also cannot distinguish the cases involving deposit base for the reason that those cases involved an acquisition of deposit base in conjunction with a larger acquisition of assets of a company. We might agree that, as a practical matter, a debtor's position with respect to its favorable financing would not be transferred, except as a part of a larger acquisition of a company or property. However, this is not, in our view, determinative of the question of whether there exists an amortizable asset of value. Indeed, in <u>Citizens & S. Corp. v. Commissioner</u>, 91 T.C. at 492-493, we stated:

> Petitioner argues in the alternative that separate sales are not required to establish that an asset has a determinable value separate from goodwill. In a case involving the purchase of a professional football team, the Fifth Circuit in <u>Laird v. United States</u>, * * * [556 F.2d 1224 (5th Cir. 1977)], held:
>
> > "the [players'] contracts had an ascertainable value separate and distinct from the value of the franchise (which thus has the same significance in this case as goodwill had in <u>Houston Chronicle</u>) * * * the valuation figure set by the district judge for the players' contracts was supported by the evidence, and reflected their own particular value, notwithstanding the fact that they were acquired in a bundle of rights and intangibles. * * *
>
> > * * * * * * *
>
> > "It does not matter for purposes of amortization if individual assets only have economic significance in the context of an integrated transaction involving the sale of a number of assets. [556 F.2d at 1233-1234. Fn. refs. omitted.]"

> Applying this analysis to deposit base, it is irrelevant for purposes of depreciation that deposit base cannot be separately transferred and only has economic significance in the context of a bank. Accordingly, the separate transferability of deposit base is not required in order to establish that deposit base has a determinable value separate and distinct from goodwill. [Citations omitted.]

We believe a similar analysis applies with respect to petitioner's favorable financing. See also Peoples Bancorporation & Subs. v. Commissioner, T.C. Memo. 1992-285. Thus, the meaningful question is whether the favorable financing had a separate and distinct value as of January 1, 1985.[11]

Because we are dealing with a specific adjusted basis rule provided by Congress in a statute which is applicable only to petitioner and which provides an adjusted basis that is in some cases different from the regular adjusted cost basis in an asset, our analogy to the cases involving core deposits, or any other situation for that matter, can never be perfect. But, we believe the principles developed in those cases do indeed support petitioner's treatment of its favorable financing as an intangible asset on January 1, 1985.[12]

---

[11]Respondent does not argue that petitioner could never transfer its favorable financing. Indeed, in his memorandum in support of his cross-motion for summary judgment at page 25, respondent points out that "Some of the Intangibles in question * * * are not likely to be disposed until petitioner itself is liquidated or acquired."

[12]We observe that petitioner's claimed favorable financing appears to present a better case, in some respects, for "asset"

(continued...)

Petitioner's favorable financing is also comparable to an interest in a favorable leasehold, which is without doubt an asset. Similar to petitioner's favorable financing, an interest in a favorable leasehold involves a lease obligation with a rental rate less than the current fair rental value of that particular interest. "There is no question that a leasehold may have a value in the hands of the lessee when the fair rental value exceeds the rent established by the lease", New Orleans La. Saints v. Commissioner, T.C. Memo. 1997-246 (citing KFOX, Inc. v. United States, 206 Ct. Cl. 143, 510 F.2d 1365, 1373-1374 (1975); A.H. Woods Theatre Co. v. Commissioner, 12 B.T.A. 827 (1928)), and, presumably, a hypothetical buyer would pay a premium to obtain the lessee's favorable position in the leasehold. It is this correlative value and premium which give rise to amortization deductions:

> A leasehold is an intangible asset that is gradually
> exhausted by the passage of time. Its cost is
> recoverable ratably by way of amortization deductions
> over the period of exhaustion in the same manner that
> costs of tangible assets are recoverable by way of
> depreciation deductions. Of course, the amortization

---

[12](...continued)
status than deposit base. For example, whereas deposit base consists of deposit accounts which have no fixed termination date and which are terminable-at-will, petitioner's debt obligations presumably have stated terms with fixed maturity dates. See Colo. Natl. Bankshares, Inc. v. Commissioner, 984 F.2d 383, 396-397 (10th Cir. 1993) (the Commissioner attempted to distinguish core deposits on the basis that those intangibles do not involve fixed-term loans with a definite life span) affg. T.C. Memo. 1990-495.

deductions are in addition to those for rent required to be paid under the lease.  See Washington Package Store, Inc. v. Commissioner, T.C. Memo. 1964-294.[13] [Id.[14]]

We see no principled difference in the tax treatment under section 167(a) of favorable financing and a favorable leasehold. We have no problem equating a right to use money at a below-market interest rate with a right to use property at a below-market rental rate.  Indeed, in Dickman v. Commissioner, 465 U.S. at 337, the U.S. Supreme Court similarly equated such rights in a case involving interest-free demand loans, stating:

> The right to the use of $100,000 without charge is a valuable interest in the money lent, as much so as the rent-free use of property consisting of land and buildings.  In either case, there is a measurable economic value associated with the use of the property transferred.  The value of the use of money is found in what it can produce; the measure of that value is interest--"rent" for the use of the funds.  We can assume that an interest-free loan for a fixed period, especially for a prolonged period, may have greater value than such a loan made payable on demand, but it would defy common human experience to say that an intrafamily loan payable on demand is not subject to accommodation; its value may be reduced by virtue of its demand status, but that value is surely not eliminated.

---

[13]Sec. 1.162-11(a), Income Tax Regs., provides:  "If a leasehold is acquired for business purposes for a specified sum, the purchaser may take as a deduction in his return an aliquot part of such sum each year, based on the number of years the lease has to run."

[14]Indeed, in New Orleans La. Saints v. Commissioner, T.C. Memo. 1997-246, the Commissioner stipulated that the favorable leasehold interest in that case was an intangible asset with a limited useful life equal to the term established in the lease.

As previously stated, this Court has also equated the use of borrowed money and interest with the use of property and rent. See Albertson's Inc. v. Commissioner, 95 T.C. at 421.

Respondent argues that petitioner's favorable financing represents a "liability", not an "asset".  Respondent claims that petitioner is "attempting to adjust, for tax purposes, the asset side of its balance sheet to account for an overstatement in fair market value terms of its liabilities."  We cannot agree with respondent's proposed characterization of petitioner's favorable financing as a liability.  Indeed, as petitioner points out, there is a valuable economic benefit associated with the below-market interest rates on its financing arrangements as of January 1, 1985.  It is this economic benefit which petitioner claims as an intangible asset and upon which it bases its claimed amortization deductions.

Respondent appears to make the same argument that he made in the context of the core deposits cases.  For example, in Peoples Bancorporation & Subs. v. Commissioner, T.C. Memo. 1992-285, respondent argued that core deposits are "liabilities" rather than "property" for purposes of section 167 and the regulations thereunder.  We rejected that argument, stating that "Similar arguments were considered in Citizens & Southern Corp. v. Commissioner, 91 T.C. at 490 and 492.  These arguments simply

fail in the face of <u>Citizens & Southern Corp. v. Commissioner</u>,
<u>supra</u>, and <u>IT&S of Iowa, Inc. v. Commissioner</u>, 97 T.C. 496
(1991)."  <u>Peoples Bancorporation & Subs. v. Commissioner</u>, <u>supra</u>.
Similarly, we believe respondent's attempts to characterize the
economic benefit inherent in petitioner's below-market financing
as a liability is misplaced, and for similar reasons we cannot
accept that characterization.

Respondent also argues that petitioner's claiming of
amortization deductions with respect to its financing
arrangements constitutes an impermissible "loop" around the
interest deductions rules of section 163 and the rules applicable
to original issue discount (OID).  Respondent argues:

> Petitioner claims a deduction based on the net
> present value differential as of January 1, 1985,
> between the hypothetical future cash flows at market
> rates over prospective future cash flows based on the
> actual contract rates on the relevant instruments.
> This differential, in effect, is analogous to discount,
> which is a substitute for interest.  Therefore, the
> petitioner is claiming deductions under I.R.C. § 167
> for what is inherently an interest item–discount or
> interest subject to the rules for deductibility under
> I.R.C. § 163.  [Fn. ref. omitted.]

We are not persuaded that petitioner's treatment of its favorable
financing implicates section 163 or the OID rules.  Petitioner's
favorable financing is an economic benefit which arises from the
below-market rates of interest on January 1, 1985, and the
expectation of cost savings from its existing financing
arrangements.  Again, this economic benefit is not a liability;

it is, in our view, an asset which is subject to amortization. Permitting amortization deductions on the basis of this intangible asset does not run afoul of the interest deduction rules of section 163 or the OID rules. We cannot agree with respondent that petitioner's claimed amortization deductions are in effect a substitute for interest.

In support of his argument that petitioner is attempting to circumvent the rules for deducting interest and OID, respondent directs our attention to section 197 where Congress specifically expressed its intent that below-market financing be addressed under present law. Section 197, which was enacted after the years in issue and does not apply to the years before us, provides rules for the amortization of certain "amortizable section 197 intangibles".[15] Under section 197(e)(5)(B), the term "section 197 intangible" does not include any interest under any

---

[15]Sec. 197 is generally effective with respect to property acquired after Aug. 10, 1993. Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13261(g), 107 Stat. 540. Sec. 197, by reason of its effective date, does not apply to the instant cases. Under sec. 197(a), a taxpayer is entitled to an amortization deduction with respect to "any amortizable section 197 intangible." The deduction under sec. 197 is determined by amortizing the adjusted basis (for purposes of determining gain) of the intangible ratably over a 15-year period beginning with the month in which the intangible was acquired. Sec. 197(a). An "amortizable section 197 intangible" is any "section 197 intangible" acquired by a taxpayer after Aug. 10, 1993, and held in connection with the conduct of a trade or business or an activity described in sec. 212. Sec. 197(c)(1); Frontier Chevrolet Co. v. Commissioner, 116 T.C. 289, 292 (2001), affd. 329 F.3d 1131 (9th Cir. 2003).

existing indebtedness.  Section 1.197-2(c)(9), Income Tax Regs.,
interprets this "exception" from section 197 treatment as
follows:

>    (9) Interests under indebtedness--(i) In general.
> Section 197 intangibles do not include any interest
> (whether as a creditor or debtor) under an indebtedness
> in existence when the interest was acquired.  Thus, for
> example, the value attributable to the assumption of an
> indebtedness with a below-market interest rate is not
> amortizable under section 197. * * *

The legislative history to section 197(e)(5)(B) states that
"the value of assuming an existing indebtedness with a below-
market interest rate is to be taken into account under present
law rather than under * * * [section 197]."  H. Conf. Rept. 103-
213, at 672 (1993), 1993-3 C.B. 393, 560.  Respondent claims that
this reference to present law refers to the rules applicable to
debt; i.e., the interest deduction rules and the OID rules.  On
the contrary, we read this legislative history to state that the
treatment of any intangible asset which might arise from below-
market financing is determined under section 167(a), section
1.167(a)-3, Income Tax Regs., and the caselaw interpreting that
Code section and regulation.  This encompasses the legal question
that we are deciding in the instant cases.  We cannot agree with
respondent's argument that the reference to present law refers to
the rules relating to interest deductions (section 163) or the
OID rules.  There is no support for that argument in the
legislative history.

Finally, we are not concerned that our holding is inconsistent with petitioner's treatment of its alleged favorable financing on its financial statements. Admittedly, petitioner did not report its alleged favorable financing as an intangible asset on its books or records, and it is not at all clear whether reporting this claimed intangible as an asset would be in accordance with Generally Accepted Accounting Principles. However, we have previously indicated that a failure to report a claimed intangible asset on financial statements or regulatory reports is not an impediment to a taxpayer's entitlement to amortization deductions. IT&S of Iowa, Inc. v. Commissioner, 97 T.C. at 511; see also Bartolme v. Commissioner, 62 T.C. 821, 830-832 (1974).[16] Our resolution of the legal question in these cases is, in any event, not dependent upon accounting principles or whether the claimed intangible asset was or was not reported as an asset on petitioner's books or records.

Our holding regarding below-market financing is supported by at least one notable treatise. In an analysis of the treatment of interests in debt obligations under postsection 197 law, 1 Ginsburg & Levin, Mergers, Acquisitions, and Buyouts, par.

---

[16]We also point out that in Peoples Bancorporation & Subs. v. Commissioner, T.C. Memo. 1992-285, the Commissioner advocated the position that the treatment of core deposits as an asset for financial and regulatory accounting purposes should be irrelevant for tax purposes.

403.4.4.3, at 4-102 to 4-103 (June 2003 ed.), concludes that the

value attributable to below-market indebtedness is amortizable:

> Code §197 never applies to the interest of a borrower
> or lender in an existing debt obligation (even when
> acquired as part of a larger business). [Fn. ref.
> omitted.] Thus, according to the * * * [January 2000]
> Regulations [interpreting section 197], "the value
> attributable to the assumption of an indebtedness with
> a below-market interest rate" is not amortizable under
> Code §197 * * *

>     *     *     *     *     *     *     *

> EXAMPLE 7. P Assumes T's Borrower Position

> P purchases all of T's assets and assumes T's
> liabilities, including T's debt to a third party
> bearing a below-market interest rate. P may amortize
> the portion of the purchase price allocable to the
> favorable financing over the remaining term of the
> debt.

IV. <u>Conclusion</u>

Favorable financing involves the right to use borrowed money

at below-market interest rates. The right to use the proceeds of

financing arrangements with below-market interest rates

constitutes an economic benefit. The benefit of petitioner's

below-market financing can, as a matter of law, constitute an

intangible asset which could be amortized if petitioner

establishes a fair market value and a limited useful life as of

January 1, 1985.

<u>An appropriate order</u>

<u>will be issued</u>.